# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1546 PENSION FUND, | |
| Plaintiff, | No. 15 CV 137 |
| v. | Judge Manish S. Shah |
| VARIETY MEAT CO., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Defendant C. G. & S. Provision Company and the union that represented some of its employees entered into collective bargaining agreements that required the company to make contributions to the plaintiff United Food and Commercial Workers Local 1546 Pension Fund. After CG&S wound down its business and sold off its building, inventory, and equipment, the fund assessed CG&S's withdrawal liability under the Employee Retirement Income Security Act, as amended by the Multiemployer Pension Plan Amendments Act of 1980. United sought and obtained a judgment against CG&S, but CG&S declared bankruptcy.

United then filed an action against defendant Variety Meat Company, the company that bought CG&S's building, meat, and some of its equipment. United seeks to collect from Variety the withdrawal liability, incurred by CG&S, under the theory of successor liability. Variety brings a motion for summary judgment. For the following reasons, Variety's motion is granted.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

## II. Facts[1]

Defendant Variety Meat Company, a wholesale meat distributor, has sold meat to restaurants, butcher shops, distributors, and others since the early 1970's. [25] ¶¶ 2, 5; [29] ¶¶ 2, 5. Its president and sole shareholder since incorporation, Calvin E. Beisswanger Sr., learned the business from his father, who began selling meat around 1930. *Id.* Calvin E. Beisswanger Jr. has served as Variety's Vice

---

[1] Bracketed numbers refer to entries on the district court docket. The facts are largely taken from Variety's LR 56.1 statement, [25], United's response, [29], and Variety's response to United's LR 56.1 statement, [32]. Unless otherwise noted, the facts related are undisputed or are considered undisputed because the responding party did not properly controvert the factual statement as required by the local rules.

President of Operations for over 30 years, overseeing all operations and supervising Variety's employees. [25] ¶ 7; [29] ¶ 7.

Between 1973 and early November 2011, Variety operated out of a building on 835 West Wayman Street in Chicago, Illinois. [25] ¶ 10; [29] ¶ 10. By the end of that time period, it owned or leased three pallet jacks, three delivery trucks, saws, knives, meat wrapping and packaging materials, computers, and other office equipment. [25] ¶¶ 11–12; [29] ¶¶ 11–12. It also maintained a daily inventory of approximately 500,000 pounds of meat, valued anywhere between $600,000 and $800,000, which it sold to its customer base of over 450 customers. [25] ¶ 13; [29] ¶ 13. As of the beginning of November 2011, Variety employed 13 people, but it had never been a party to a collective bargaining agreement. [25] ¶ 2; [29] ¶ 2.

Another wholesale meat distributor, C. G. & S. Provision Company, operated out of a building located at 159 North Carpenter Street (about 4 blocks away from Variety). [25] ¶¶ 14, 23; [29] ¶¶ 14, 23. CG&S had been incorporated in 1991 by Marty Cosentino and Burt Rottman, its only shareholders, officers, and directors. [25] ¶¶ 15–16; [29] ¶¶ 15–16. It was a party to a collective bargaining agreement, making pension contributions on behalf of its employees to plaintiff United Food and Commercial Workers Local 1546 Pension Fund. [25] ¶ 17; [29] ¶ 17. In early November 2011, it employed 11 people and had roughly 100 customers. [25] ¶¶ 18–19; [29] ¶¶ 18–19.

At a certain point, Variety sought a space larger than its Wayman Street location, and CG&S wanted to wind down its business. The Carpenter Street

3

building that housed CG&S was put on the market, and on November 4, 2011, Beisswanger Holdings, L.L.C., a company whose sole member is Beisswanger Sr., bought it. [25] ¶ 23; [29] ¶ 23.[2] Beisswanger Holdings entered into a lease with Variety, and Variety moved its operations into the building over the course of a few days. *Id.* Meanwhile, CG&S stopped selling meat and, based out of Cosentino's home, existed for the next several months primarily to collect on its accounts receivable. [25] ¶ 20; [29] ¶ 20.

On November 7, 2011, Variety added to its staff by hiring three of CG&S's seven union employees, as well as Cosentino himself. [25] ¶¶ 24, 27; [29] ¶¶ 24, 27. The three employees, Enrique Carapia, Rafael Najera, and Lee Gordon, filled customer orders and drove trucks for Variety, and Cosentino made sales and took orders. [25] ¶¶ 25–26; [29] ¶¶ 25–26. None of them were hired in a management capacity, and their employment benefits did not take into account their time at CG&S. *Id.* Variety eventually fired Carapia for misconduct in February 2012. [25] ¶ 26; [29] ¶ 26.

On November 11 and 18, 2011, Variety paid CG&S $5,198.00 for some of its equipment and $41,688.02 for its remaining meat. [25] ¶¶ 28–29; [29] ¶¶ 28–29. The meat and equipment purchased amounted to roughly 5% of the meat and

---

[2] The parties dispute who sold the building to Variety—United claims Variety bought it directly from CG&S, and Variety claims it purchased the building from nonparty Chicago Title Land Trust Company. [25] ¶ 23; [29] ¶ 23. The parties also dispute whether CG&S ever owned the Carpenter Street building, *see* [32] ¶ 1, but Cosentino's declaration suggests that it did, [25-4] ¶ 3. The record does not include a purchase agreement for the building.

4

equipment Variety already had. *Id*. The purchases were not documented by bills of sale or asset purchase agreements. [25] ¶ 31; [29] ¶ 31.

As a result of CG&S discontinuing its meat sales, Variety gained four new customers. [25] ¶ 35; [29] ¶ 35. But Variety does not have exclusive contracts with those, or any, customers, consistent with industry practice. *Id*. And Variety did not assume any of CG&S's contracts or work orders, collect on any of CG&S's accounts receivable, honor warranties for any of CG&S's products, pay any of its debts, or use its name, signage, registered agent, or professional advisors. [25] ¶ 33; [29] ¶ 33.

Beisswanger Sr. and Beisswanger Jr. claim that they did not conduct any due diligence on CG&S prior to buying its meat and equipment. [25] ¶ 32; [29] ¶ 32. And according to them, they did not know anything about CG&S's financial condition or whether it had debts or obligations, and they were not familiar with CG&S's union obligations or the concept of withdrawal liability. *Id*. Beisswanger Sr. and Beisswanger Jr. never worked for CG&S, although Beisswanger Sr. did work for a predecessor of CG&S in around 1954 or 1960. [32] ¶ 4. Similarly, Cosentino claims that he never knew that CG&S might be liable to the pension fund for withdrawal liability, and that he never discussed withdrawal liability with Beisswanger Sr. or Beisswanger Jr. [25] ¶ 21; [29] ¶ 21.

In December 2011, CG&S made its last pension contribution to the fund. [25] ¶ 21; [29] ¶ 21. On February 1, 2012, United's counsel sent CG&S a letter providing notice that CG&S had completely withdrawn from the fund and requesting payment of its corresponding withdrawal liability. [25] ¶ 37; [29] ¶ 37. On January 16, 2013,

after United filed an action against CG&S to recover, a judgment order was entered against CG&S in the amount of $377,891.41, plus court costs and attorney's fees. [25] ¶ 38; [29] ¶ 38. CG&S filed for Chapter 7 bankruptcy, and on November 10, 2014, United informed Variety that it might be liable as a successor to CG&S. [25] ¶ 42; [29] ¶ 42. Variety asked United for the basis of its assertion, and United responded by filing this action. [25] ¶ 43; [29] ¶ 43.

## III. Analysis

The applicable statute imposes liability, known as withdrawal liability, on employers that stop participating in multiemployer pension plans. *See* 29 U.S.C. § 1381. The amount of the liability is related to the employer's share of the plan's "unfunded vested benefits." *Id*. This imposition avoids funding deficiencies, ensures that the remaining employer participants do not have to pay disproportionate shares of the plan benefits when one of them withdraws, and prevents the creation of a disincentive to new employers joining the plan. *Tsareff v. ManWeb Services, Inc.*, 794 F.3d 841, 846 (7th Cir. 2015). When an employer withdraws from a multiemployer plan, "the plan sponsor calculates the amount of liability owed by the employer and, as soon as practicable, notifies the employer of the amount due and demands payment." *Tsareff*, 794 F.3d at 846; 29 U.S.C. § 1382.

Although the general common law rule is that, after an asset sale, the purchaser is not liable for the debts and liabilities of the seller, courts may impose liability upon successors in the context of withdrawal liability after balancing equitable considerations with the need to vindicate the policies underlying the

6

federal statutes.[3] *Tsareff*, 794 F.3d at 845. To impose successor liability for unpaid multiemployer pension fund withdrawal liability, a plaintiff must show that (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale.[4] *Id.*

A. Notice

To impose liability on a purchaser like Variety, a plaintiff must show that the purchaser had notice of the seller's liability prior to the asset sale. *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). "The notice requirement is animated by

---

[3] United claims that successor liability for withdrawal liability can never be determined on a motion for summary judgment, because the determination involves analysis of federal policy goals. But this argument is unpersuasive, because the cases cited by United do not support that contention, and because there is nothing unique about federal policy goals that make their analysis impossible on summary judgment. A narrower, and more favorable, reading of United's argument may be that summary judgment is not appropriate here because the record lacks the facts necessary to make an equitable determination, taking into account federal policy goals. But United does not explain why federal policy goals cannot be addressed at summary judgment or identify any related issues that require further factual development.

[4] United argues that a more appropriate test is the general federal common law standard of successor liability employed in *Teed v. Thomas & Betts Power Solutions, L.L.C.*, 711 F.3d 763 (7th Cir. 2013), a case involving successor liability in the context of a violation of the Fair Labor Standards Act. The Seventh Circuit decided *Tsareff*, a highly relevant case addressing successor liability in the context of contingent withdrawal liability, after *Teed*, and *Tsareff* applies here. *See also Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990) (articulating established test for successor liability in this context). In any event, employing United's requested test would not change the outcome of this motion. The standard used in *Teed* included three additional factors that courts have found relevant to successor liability in other contexts: whether the relief sought could have been provided by the predecessor before the sale, by the predecessor after the sale, or by the successor now. *Teed*, 711 F.3d at 765–66. Neither Variety's current nor CG&S's pre-sale wherewithal is conclusively established, but assuming in United's favor that Variety is able to pay and CG&S could not have paid post-sale (because of its bankruptcy), those factors would not outweigh a lack of notice or substantial continuity. If Variety lacked notice and there did not exist substantial continuity in business operations, then Variety's superior ability to provide the relief requested would not justify forcing it to provide that relief.

7

concerns that it is inequitable to impose successor liability upon an innocent purchaser who did not have an opportunity to protect itself by obtaining indemnification or negotiating a lower purchase price." *Tsareff*, 794 F.3d at 849. Armed with prior notice, the purchaser can negotiate the transaction such that "the burden of liability will be shifted back to the owners of those assets, where it belongs." *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990) (quoting *E.E.O.C. v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988)). The notice requirement does not mean that the precise amount of withdrawal liability must be known to the buyer—notice of contingent withdrawal liability is sufficient. *Tsareff*, 794 F.3d at 847. "Notice can be proven not only by pointing to the facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances." *Artistic Furniture*, 920 F.2d at 1329.

Variety argues that it had neither actual nor implied knowledge of CG&S's contingent withdrawal liability prior to the sale of the building on November 4, 2011, the sale of the equipment on November 11, 2011, or the sale of the meat on November 18, 2011. It claims that its president and owner, Beisswanger Sr., and its vice president, Beisswanger Jr., did not know about the potential for withdrawal liability prior to the sales—they were never informed of the liability by anyone at CG&S or elsewhere, and they did not conduct any due diligence of their own.

United argues that Beisswanger Sr. was likely aware of the potential for withdrawal liability because he knew CG&S was affiliated with a union, he had

8

worked in the industry for a long time, and he had worked for a CG&S predecessor at one point.[5] It also claims that the fact that Variety has not entered into any union contracts proves that Beisswanger Sr. is familiar with union contracts and pension funds.

United analogizes Beisswanger Sr. to the purchaser's owners in *Tsareff*, 794 F.3d 841. In that case, the Seventh Circuit found that the successor company had sufficient notice of the predecessor's contingent withdrawal liability because its owners "were aware of [the predecessor's] union obligations and shared concerns related to unfunded pension plan liabilities," because financial statements attached to the sales agreement warned of the potential for withdrawal liability, and because the sales agreement contained a clause purporting to exclude liabilities related to pension obligations. *Tsareff*, 794 F.3d at 848. Here, the record shows that Beisswanger Sr. and Beisswanger Jr. were not familiar with CG&S's union obligations or even the concept of withdrawal liability. The fact that Beisswanger Sr. was generally aware of CG&S's affiliation with a union does not suggest he was aware of that union's potentially underfunded multiemployer pension plan. United provides no support for its argument that working in the wholesale meat industry would lead to such awareness. Nor does it explain how Variety's decades-long lack of union affiliation would make Beisswanger Sr. more, rather than less, familiar

---

[5] Although neither party's LR 56.1 statement of facts, or responses thereto, mention Beisswanger Sr.'s awareness of CG&S's union affiliation, he admitted in his deposition that he "thought they were unionized." [28-1] at 16. But United's argument is somewhat hampered by its admission that Beisswanger Sr. did not even know what withdrawal liability was at the time of the asset purchases. [25] ¶ 32; [29] ¶ 32.

9

with union pension funds. And while Beisswanger Sr. did work for a CG&S predecessor early in his career, it was more than 50 years ago, well before the enactment of the federal statutes establishing withdrawal liability. This is a far cry from the purchaser's owners in *Tsareff*, who were familiar with withdrawal liability in general and the potential liability of the seller in particular.

United argues that, prior to purchasing the Carpenter Street building, Beisswanger Sr. should have reviewed CG&S financial records and union obligations, and had he done so, he would have learned of the contingent liability.[6] But the Seventh Circuit has refused to impose a requirement for potential successor companies to conduct due diligence or inquire as to potential liabilities prior to an asset purchase in order to avoid successor liability. *See Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1237 (7th Cir. 1986). Further, United does not identify anything that would have provided the Beisswangers sufficient notice to prompt them to investigate CG&S's financial conditions or potential withdrawal liability. It only claims that prior to purchasing the building, Beisswanger Sr. would have reviewed CG&S's financial records to ensure that the building's title was clear. But that is the purpose of obtaining a title insurance policy, which Variety helpfully provides, *see* [32] at 5–13. And Beisswanger Sr.'s general awareness of CG&S's

---

[6] United also claims that the record does not conclusively establish that Beisswanger Sr. did not conduct any due diligence prior to purchasing the building. But Variety's statement of facts, Beisswanger Sr.'s declaration, and Cosentino's declaration state that he did not. Because United does not cite to anything in the record to suggest otherwise, this fact is undisputed.

10

union affiliation would not be enough to put him on inquiry notice, given that he is unfamiliar with union-related pension funds.

United also disputes the fact that Cosentino was not aware of CG&S's contingent withdrawal liability prior to the sales. It argues that it is reasonable to infer his awareness because of his involvement in making contributions to the fund, and that there is a question of fact regarding whether his knowledge can be imputed to Variety because he began working for Variety prior to the meat and inventory sales. Variety maintains that Cosentino did not know that CG&S might be liable for withdrawal liability. It also argues that even if he did know about CG&S's contingent liability, he never told anyone at Variety about it, either before or after the sales, and that his knowledge cannot be imputed to Variety because he is not employed in a managerial or supervisory role

While all reasonable inferences must be drawn in United's favor, United does not provide any factual basis for its belief that Cosentino was aware of CG&S's contingent withdrawal liability before receiving the February 1, 2012 notice from United. But even if he were aware, United concedes that Cosentino did not tell the Beisswangers prior to the final sale on November 18, 2011, that CG&S might be subject to withdrawal liability. And United admits that Cosentino is not an owner, officer, director, manager, or supervisor at Variety, but an employee whose duties include selling meat and taking customer orders. He certainly is not a member of Variety's control group, and his duties at Variety do not encompass managing employee benefits or monitoring potential union obligations such that his

11

knowledge would be imputed to Variety. *See* Restatement (Third) of Agency § 5.03 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal.")

Thus, Variety did not have notice of the contingent withdrawal liability before buying CG&S's assets. Because it was an innocent purchaser that lacked the opportunity to negotiate its purchase price downwards or secure indemnification rights, it would be inequitable to impose upon it the withdrawal liability incurred by CG&S.

### B. Substantial Continuity

The requirement that "there be substantial continuity in the operation of the business before and after the sale . . . is satisfied if no major changes are made in that operation." *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994). The requirement is a variant of the common-law continuity exception to nonliability, which applies "where the purchasing corporation is a mere continuation of the seller." *Wheeler*, 794 F.2d at 1237 n.8. "Substantial continuity requires a fact-centered analysis." *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354, 358 (7th Cir. 2014). Relevant factors include whether the buyer employs "substantially all" of the seller's workforce, its use of the seller's plant, machinery, and equipment, its production of the same product, its completion of the seller's work orders, its honoring of warranty claims for goods sold by the seller, and whether management

personnel stayed on in the same positions. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990).

United believes that Variety is a substantial continuation of CG&S because it operated out of the same building, employed CG&S's owner and three of its remaining ten employees, offered the same jobs that CG&S offered, used CG&S's equipment, operated in the same industry, produced the same product, and serviced some of the same customers. Variety argues that there is no substantial continuity of business operations between itself and CG&S sufficient to establish successor liability, because the two companies are separate and distinct businesses without significant overlap of ownership, workforce, or management.

The undisputed facts in the record show that there is not substantial continuity between Variety and CG&S. While Variety uses the same building and equipment to produce and sell the same product in the same industry to some of the same customers, there is enough evidence to support Variety's claim that the businesses are distinct. Variety only hired four people out of the eleven remaining members of CG&S's staff, which does not amount to "substantially all" of CG&S's workforce. And those four employees did not constitute a substantial part of Variety's workforce, which consisted of seventeen members after the sales. The two companies are wholly distinct in both ownership and management. Variety did not complete CG&S's work orders (although whether CG&S had any outstanding work orders has not been established), or honor warranties on CG&S's past orders. It does not rely on the same advisors or registered agent. The assets purchased and

13

customers gained were exceedingly small relative to the inventory, equipment, and customers Variety already depended upon prior to the purchase. This is not a case where post-sale Variety was a "mere continuation" of CG&S, or that no major changes were made in business operations. Variety, a bigger company that predates CG&S's incorporation by 20 years, merely moved its pre-existing operations into CG&S's building, absorbing some additional inventory, equipment, and employees to exploit its larger space.

When determining whether to impose successor liability, courts must "strike a proper balance between on the one hand preventing wrongdoers from escaping liability and on the other hand facilitating the transfer of corporate assets to their most valuable uses." *E.E.O.C. v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988). While a ruling in favor of Variety will leave United, and its remaining contributing employers, "holding the bag," *Tsareff*, 794 F.3d at 846, Variety is an innocent purchaser and distinct from the seller. It is not liable for the withdrawal liability incurred by CG&S.

## IV. Conclusion

Variety's motion for summary judgment, [23], is granted. Enter judgment in favor of Variety, and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 6/10/16

14